**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | |
|---|---|
| DAIDRON WILLIAMS,<br>NIJA GUIDER,<br>KEYLON WOODARD,<br>AARON CONELLY,<br>CAYD MARTIN,<br>EUTYCHUS WILSON,<br>ANDREA LOPEZ,<br><br>on behalf of themselves and a class of<br>similarly situated persons,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>CITY OF CARTERSVILLE,<br><br>JOSHUA COKER, Deputy, Cartersville<br>Police Department, in his individual<br>capacity,<br><br>GARY TURNER, Deputy, Cartersville<br>Police Department, in his individual<br>capacity,<br><br>LUKE PULLIAM, Deputy, Cartersville<br>Police Department, in his individual<br>capacity,<br><br>CULLEN LAFRANCE, Sergeant,<br>Cartersville Police Department, in his<br>individual capacity, | COMPLAINT<br><br>CIVIL ACTION NO. _____<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

1

| | |
|---|---|
| CHASE RANDALL, Deputy,<br>Cartersville Police Department, in his<br>individual capacity, | ) |
| | ) |
| MARK MAYTON, Major, Bartow-<br>-Cartersville Drug Task Force,<br>in his individual capacity, | ) |
| | ) |
| JOHN or JANE DOES 1-20, Deputies,<br>Cartersville Police Department, in their<br>individual capacities, | ) |
| | ) |
| JOHN or JANE DOES, 21-25,<br>Deputies, Bartow County Sheriff's<br>Office, in their individual capacities, | ) |
| | ) |
| Defendants. | ) |

## **PRELIMINARY STATEMENT**

1.    Plaintiffs bring this civil rights action under 42 U.S.C. § 1983

challenging the mass detention, seizure, search, and arrest of over sixty students,

college graduates, and military servicemen attending a birthday party at a private

residence in Cartersville, Georgia on New Year's Eve.

2.    On December 31, 2017, Cartersville Police Department officers—

acting pursuant to a municipal policy of warrantless home entry due to alleged

marijuana odors outside the home—entered the home without a warrant or exigent

circumstances justifying their entry.  Once inside the private home, the officers,

again acting pursuant to city policy, immediately seized and ordered everyone to

2

move to a designated area.  After everyone moved, the officers allegedly saw small amounts of marijuana in certain common areas.

3.     Without any reasonable or particularized suspicion to believe that any individual visitor, let alone every person at the party, possessed, had knowledge of, or exercised control over the suspected marijuana located in the private home, Cartersville police officers announced that no one was free to leave and detained and seized everyone at the party.  Over the course of several hours, officers prohibited some visitors from using the restroom or their cellphones to alert parents as to their whereabouts.  About half of the visitors were forced to stand outside, where temperatures ranged from 20 to 30 degrees.

4.     Officers from the Bartow County-Cartersville Drug Task Force later arrived and placed everyone under arrest for possessing less than an ounce of marijuana.  It was only after announcing that everyone was under arrest that officers searched every visitor before transporting them to the Bartow County Jail; no drugs were found during these searches.

5.     Upon arriving at the jail, Plaintiffs and other putative class members were stripped-searched in front of multiple officers and held in crowded holding tanks for 1-3 days without access to phones, the courts, or counsel.  Jail staff placed signs on the holding cell windows that read "THE PARTY CREW."

Some, including Plaintiff Cayd Martin, were placed in solitary confinement for complaining about their treatment.

6.    The visitors' loved ones paid bond amounts preset by the Bartow County Sheriff's bond schedule to secure their release.  After their release, Plaintiffs and other putative class members returned home to find their booking pictures and details surrounding the mass arrest circulating widely on the internet, social media, and various news outlets both in and outside of Georgia.  The highly-publicized arrests for misdemeanor marijuana possession caused some Plaintiffs and putative class members, including Plaintiffs Daidron Williams and Nija Guider, to lose their jobs.  The mass arrest also affected the military prospects of some Plaintiffs and putative class members including Plaintiff Keylon Woodard, whose scheduled enlistment in January 2018 was delayed by this arrest.  Others, including Plaintiffs Cayd Martin and Andrea Lopez, missed work because of this arrest.

7.    Twelve days after the arrests, the Bartow County District Attorney dismissed the charges against Plaintiffs and all putative class members "because the facts of the case indicate that there [was] insufficient evidence to convict" the visitors of any crime.

8.    Plaintiffs seek damages and declaratory relief on behalf of a class of all visitors who were seized, arrested, and charged with crimes on December 31, 2017, and whose charges were dismissed on January 12, 2018.

## JURISDICTION AND VENUE

9.    This action is brought pursuant to 42 U.S.C. § 1983, and this Court has jurisdiction under 28 U.S.C. §§1331 and 1343.

10.    Plaintiffs also bring state-law claims arising out of the same events and occurrences.  The Court may exercise supplemental jurisdiction over these claims under 28 U.S.C. § 1367.  Declaratory relief is available under 28 U.S.C. § 2201.

11.    Venue is proper in this district and division because the acts and omissions at issue occurred in Bartow County.

## PARTIES

### A. Plaintiffs

12.    Daidron Williams is a 23-year-old father.  On December 31, 2017, Defendants detained, searched, and arrested Williams without any individualized suspicion or any reason to believe that he was engaged in any unlawful activity.

13.    Nija Guider is a 22-year-old machine operator and single mother.  On December 31, 2017, Defendants detained, searched, and arrested she without any

individualized suspicion or any reason to believe that Guider was engaged in any unlawful activity.

14.    Keylon Woodard is a 22-year-old graduate of Cass High School in Cartersville, Georgia.  On December 31, 2017, Defendants detained, searched, and arrested Woodard without any individualized suspicion or any reason to believe that he was engaged in any unlawful activity.

15.    Aaron Conelly is a 22-year-old Cartersville native and former airman in the United States Air Force.  On December 31, 2017, Defendants detained, searched, and arrested Conelly without any individualized suspicion or any reason to believe that he was engaged in any unlawful activity.

16.    Cayd Martin is a 21-year-old construction worker.  On December 31, 2017, Defendants detained, searched, and arrested Martin without any individualized suspicion or any reason to believe that he was engaged in any unlawful activity.

17.    Eutychus Wilson is a 20-year-old high college student.  On December 31, 2017, Defendants detained, searched, and arrested Wilson without any individualized suspicion or any reason to believe that he was engaged in any unlawful activity.

18.    Andrea Lopez is a 23-year-old college graduate and personal banker. On December 31, 2017, Defendants detained, searched, and arrested Lopez without any individualized suspicion or any reason to believe that she was engaged in any unlawful activity.

**B. Defendants**

19.    The City of Cartersville, Georgia, is a municipal governmental entity whose policies, practices, and customs were a moving force in the constitutional violations described in this Complaint.  Specifically, the City has a well-settled policy and practice of entering homes without search warrants or exigent circumstances solely on the basis of purported marijuana odors, and seizing any occupants found inside the home without individualized suspicion or probable cause.  Because these policies, customs, or practices violated Plaintiffs' and putative class members' constitutional rights, the City is liable under 42 U.S.C. § 1983.

20.    Defendant Joshua Coker was employed as a deputy in the Cartersville Police Department at all times relevant to this Complaint.  Coker personally participated in the mass detention of Plaintiffs and other visitors.  Coker acted without any individualized suspicion or reason to believe that any Plaintiff or other visitor possessed marijuana.  Coker has caused, authorized, condoned, ratified,

approved, and knowingly participated in a policy, practice, or custom of (A) entering homes without warrants solely on the basis of purported marijuana outside the home; and (B) seizing all occupants inside the home based solely on the smell of suspected marijuana.  Coker acted under color of law and violated the clearly established constitutional rights of the individuals he detained and arrested.  He is sued in his individual capacity.  Coker is a resident of Georgia.

21.     Defendant Gary Turner was employed as a deputy in the Cartersville Police Department at all times relevant to this Complaint.  Turner ordered the mass detention of Plaintiffs and other visitors and told everyone they were not free to leave.  He further participated in the mass arrest of all visitors.  Turner acted without any individualized suspicion or reason to believe that any Plaintiff or other visitor possessed marijuana.  Turner has caused, authorized, condoned, ratified, approved, and knowingly participated in a policy, practice, or custom of (A) entering homes without warrants solely on the basis of purported marijuana outside the home; and (B) seizing all occupants inside the home based solely on the smell of suspected marijuana.  Turner acted under color of law and violated the clearly established constitutional rights of the individuals he detained and arrested.  He is sued in his individual capacity.  Turner is a resident of Georgia.

22.     Defendant Luke Pulliam was employed as a deputy in the Cartersville Police Department at all times relevant to this Complaint.  Pulliam personally participated in the mass detention of Plaintiffs and other visitors.  Pulliam acted without any individualized suspicion or reason to believe that any Plaintiff or other visitor possessed marijuana.  Pulliam has caused, authorized, condoned, ratified, approved, and knowingly participated in a policy, practice, or custom of (A) entering homes without warrants solely on the basis of purported marijuana outside the home; and (B) seizing all occupants inside the home based solely on the smell of suspected marijuana.  Pulliam acted under color of law and violated the clearly established constitutional rights of the individuals he detained and arrested.  He is sued in his individual capacity.  Pulliam is a resident of Georgia.

23.     Defendant Cullen LaFrance was employed as a sergeant in the Cartersville Police Department at all times relevant to this Complaint.  LaFrance personally participated in the mass detention of Plaintiffs and other visitors.  LaFrance acted without any individualized suspicion or reason to believe that any Plaintiff or other visitor possessed marijuana.  LaFrance has caused, authorized, condoned, ratified, approved, and knowingly participated in a policy, practice, or custom of (A) entering homes without warrants solely on the basis of purported marijuana outside the home; and (B) seizing all occupants inside the home based

9

solely on the smell of suspected marijuana.  LaFrance acted under color of law and violated the clearly established constitutional rights of the individuals he detained and arrested.  He is sued in his individual capacity.  LaFrance is a resident of Georgia.

24.     Defendant Chase Randall was employed as a deputy in the Cartersville Police Department at all times relevant to this Complaint.  Randall personally participated in the mass detention of Plaintiffs and other visitors. Randall acted without any individualized suspicion or reason to believe that any Plaintiff or other visitor possessed marijuana.  Randall has caused, authorized, condoned, ratified, approved, and knowingly participated in a policy, practice, or custom of (A) entering homes without warrants solely on the basis of purported marijuana outside the home; and (B) seizing all occupants inside the home based solely on the smell of suspected marijuana.  Randall acted under color of law and violated the clearly established constitutional rights of the individuals he detained and arrested.  He is sued in his individual capacity.  Randall is a resident of Georgia.

25.     Defendant Mark Mayton was employed as a major in the Bartow-Cartersville Drug Task Force at all times relevant to this Complaint.  Mayton has caused, authorized, condoned, ratified, approved, and knowingly participated in a

policy and practice of (A) entering homes without search warrants solely on the basis of purported marijuana odors, and (B) seizing all occupants without any individualized suspicion or probable cause.  Mayton personally participated in the mass detention and arrests of Plaintiffs and other visitors on December 31, 2017. Mayton acted without any individualized suspicion or reason to believe that any Plaintiff or other visitor possessed marijuana.  He acted under color of law and violated the clearly established constitutional rights of the individuals he detained and arrested. He is sued in his individual capacity.  Mayton is a resident of Georgia.

26.     John or Jane Does 1-20 are employees of the Cartersville Police Department who participated in the mass search, seizure, and arrest of Plaintiffs and other visitors on December 31, 2017.  John or Jane Does 1-20 acted without any individualized suspicion or reason to believe that any Plaintiff or other visitor possessed marijuana.  John or Jane Does 1-20 have caused, authorized, condoned, ratified, approved, and knowingly participated in a policy, practice, or custom of (A) entering homes without warrants solely on the basis of purported marijuana outside the home; and (B) seizing all occupants inside the home based solely on the smell of suspected marijuana.  John or Jane Does 1-20 acted under color of law and violated the clearly established constitutional rights of the individuals they

searched, detained, and arrested.  Plaintiffs do not know the identities of these employees but will amend this complaint to include their names as soon as possible.  They are sued in their individual capacities.  Upon information and belief, John or Jane Does 1-20 are residents of Georgia.

27.    John or Jane Does 21-25 are employees of the Bartow County Sheriff's Office who posted Plaintiffs' booking photographs on the county jail website in violation of Georgia law.  Plaintiffs do not know the identities of these employees but will amend this complaint to include their names as soon as possible.  They are sued in their individual capacities. Upon information and belief, John or Jane Does 21-25 are residents of Georgia.

## STATEMENT OF FACTS

### A. Defendants Lacked Justification for the Mass Detention, Search, and Arrest of 64 Visitors for Misdemeanor Marijuana Possession.

28.    On December 30, 2017, Plaintiffs and multiple other visitors attended a birthday party at 2 Cain Drive in Cartersville, Georgia.

29.    Visitors included active servicemen, college graduates, high school students, and people employed in the community.

30.    Around 2:00 a.m. on December 31, 2017, Defendants Coker and Pulliam were dispatched to a nearby apartment complex to respond to reports of

12

two gunshots.  Defendant Turner was also dispatched to the area as a back-up officer.  All three officers drove separately to the area.

31.    Defendant Pulliam went to the apartment complex, but Defendant Coker did not.  Rather, he continued driving in the area and turned down Cain Drive.  While driving on Cain Drive, Defendant Coker allegedly smelled marijuana despite his car windows being up.

32.    Defendant Coker then saw four African-American men standing in the front yard of 2 Cain Drive.  Upon seeing the men, Defendant Coker radioed Defendant Pulliam, who by that time, had found no evidence of gunshots at the apartment complex.  Defendant Coker also radioed Defendant Turner.

33.    Defendants Pulliam and Turner, who had by that time arrived on the scene, approached the four men standing outside of the private home with Defendant Coker.  Defendants Coker, Pulliam, and Turner told the four visitors they were called to the area because of gun shots.  The four visitors explained that they had not heard gunshots in the area.

34.    Defendants Coker, Pulliam, and Turner then asked what was happening inside the home.  The four visitors explained that there was a birthday party going on inside the private home.

35.    Pursuant to a city policy of entering homes and surrounding curtilage without a search warrant in response to marijuana odors, Defendants Coker, Pulliam, and Turner entered the front door of 2 Cain Drive without valid consent, a warrant, or probable cause.[1]  At a suppression hearing stemming from an arrest that night, the Bartow County District Attorney confirmed the officers had no consent to enter the home.  *See* Tr. of Mot. to Suppress Hearing at 23, *State v. Hall* (Bartow County Super. Ct. Sept. 4, 2018) (No. 18-CR-517) (hereinafter "Hall Tr.") ("I don't think at any point in time there is any evidence ever given by any officer that they had consent to be there, consent to come into the home, consent to pat them down.  The State cannot stand on that leg and we certainly agree with that.").

36.    Acting pursuant to a city policy, Defendant Coker entered the private home and ordered every visitor to come into plain view, including people who were in restrooms, bedrooms, and outside the home when the Defendants first

---

[1] *See* Tr. of Mot. to Suppress Hearing at 23, *State v. Hall* (Bartow County Super. Ct. Sept. 4, 2018) (No. 18-517) (reflecting sworn testimony from Defendant Coker about the Cartersville Police Department's warrantless entry policy when suspected marijuana is smelled outside a home); Order Granting Mot. to Suppress at 3, *State v. Hall* (Bartow County Super. Ct. Sept. 12, 2018) (No. 18-517) ("[Defendant] Mayton stated that it is the policy of Bartow County that if marijuana is smelled outside a residence then officers may enter the curtilage and into the residence without a search warrant.  [Defendant] Mayton said that officers followed this procedure [on December 31, 2017].").

arrived.[2]  Defendant Turner then announced to everyone both in and outside the private home, regardless of their location at the time of Defendants' arrival or proximity—or lack thereof—from the suspected marijuana, that they were being detained because of the marijuana smell allegedly coming from the private home. From that point forward, no one was free to leave.

37.     Defendants' sole basis for detaining Plaintiffs and other visitors was their presence at a birthday party, not the existence of any facts or circumstances that would lead a reasonable officer to believe that any one visitor possessed, had knowledge of, or otherwise exercised control over any suspected marijuana. Defendant LaFrance testified at a suppression hearing stemming from an arrest at the party that "our policy is . . . if we walk up to the house and . . . we smell [a suspected marijuana odor] coming from within the house, our policy at that time is to enter the house to detain everybody in the house . . . ."  *See* Hall Tr. at 46-47. Defendant Coker corroborated this testimony at the suppression hearing.  When asked if the smell of suspected marijuana outside of a private home justifies warrantless entry into a private home, Defendant Coker agreed that it is the

---

[2] *See* Hall Tr. at 23 (reflecting sworn testimony from Defendant Coker about the Cartersville Police Department's policy of seizing all occupants after conducting warrantless home entries).

Cartersville Police Department policy to: (1) enter the home, and (2) detain all occupants and clear the home.  *See* Hall Tr. at 22-23.

38.     After Defendant Turner ordered the mass detention of all visitors, Defendant Coker radioed for more officers to come to the private home.  One of those officers, Defendant LaFrance, called the Bartow-Cartersville Drug Task Force ("DTF"), a division of the Bartow County Sheriff's Office whose mission is to "aggressively target, arrest and convict any individuals or organizations who possess, distribute, or manufacture illegal drugs in Bartow County as well as organized criminal activity."[3]

39.     Defendants LaFrance, Randall, Mayton, and John or Jane Does 1-20 were among the officers who arrived at 2 Cain Drive.  Over the next two hours, Defendants Coker, Pulliam, Turner, Randall, LaFrance, Mayton, and John or Jane Does 1-20 confined every visitor to the inside of the home or outside, where temperatures ranged from 20-30 degrees.

40.     During this time, the visitors were subjected to humiliating treatment. Some Defendants prohibited the visitors from moving, with one officer screaming "don't fucking move – stay where you are" at a visitor.

---

[3] Bartow-Cartersville Drug Task Force Website, https://www.bartow.org/bartow-cartersville-drug-task (last visited Mar. 8, 2019).

16

41.    Other Defendants prohibited some visitors from using the restroom; some who were allowed to use the restroom had to leave the restroom door open.

42.    Some Defendants prohibited visitors from using their phones.  For instance, when a female visitor attempted to use her phone, one officer took her phone, slammed it on a table, and walked off.  The female guest was later able to retrieve her phone, but the officer grabbed it from her once he realized she was filming him and other officers.

43.    Visitors were not informed of how long they would be detained or if they would be released without arrest.  Because of the long wait, some visitors ultimately fell asleep on the floor.

44.    Around 4:30 a.m. on December 31, 2017—hours after Defendants Coker, Pulliam, Turner, Randall, LaFrance, Mayton, and John or Jane Does 1-20 entered the private home and detained every visitor within it without a warrant or probable cause—DTF Agent Matthew Maceikis applied for a search warrant for 2 Cain Drive to determine if the crime of possessing less than an ounce of marijuana had occurred at the residence.  Maceikis noted in his search warrant application that "[a]ll subjects inside the residence were detained pending the issuance of a search warrant."  To determine if the offense of misdemeanor marijuana possession had been committed, Maceikis sought permission to search "the entire

residence and it's (sic) curtilage and all storage facilities, outbuildings, vehicles, and persons present during the execution of the search warrant." The application for the warrant did not indicate that the officers had entered the residence without valid consent, or that they had seized the entire group. A Bartow County magistrate issued the warrant.

45.    After hours of detention, other DTF members arrived at 2 Cain Drive and announced that they had a search warrant.

46.    Defendants Coker, Pulliam, Turner, LaFrance, and John or Jane Does 1-20 then began moving all of the visitors outside. Once outside, the officers asked every person for their name, date of birth, and contact information. The officers then performed pat-down searches of the fronts and backs of every visitor, and in some cases performed intrusive searches of the visitors' private parts. The officers also searched the visitors' clothes pockets. The officers found no drugs, drug-related paraphernalia, or other contraband during these searches. Despite the lack of any evidence tying any one visitor to a crime, an officer announced that everyone was going to jail. All of the visitors were charged with possession of less than an ounce of marijuana.[4] In total, sixty-four putative class members were

_____

[4] Two visitors were also charged with crossing guard lines with a controlled substance, and a third was charged with crossing the guard lines with a controlled substance and possession of a Schedule II controlled substance. All of these

arrested.  Of those sixty-four, fifty were African-American, nine were white, three were Latino, and one was Native American.

47.    Defendants Coker, Pulliam, Turner, LaFrance, and John or Jane Does 1-20 then zip-tied the wrists of all the visitors and led them by the arm towards the Bartow County Sheriff's vans for transport to the county jail.  Defendants performed one additional pat-down on the visitors as they entered the vans.  Like the first pat-down search, this second search yielded no drugs or other contraband.

48.    The vans made several trips to and from the jail to pick up visitors because of the large number of people being arrested.  Once they were at the jail garage, the vans remained outside for upwards of an hour with the arrested visitors inside.  During that time, some visitors asked to go inside the jail to use the restroom.  At least one visitor was told he could not use the restroom and should "just piss on yourself."  The visitor ultimately urinated on himself while sitting in the van.

---

charges were dismissed on January 12, 2018.  A fourth visitor was charged with possessing cocaine and marijuana.  *State v. Hall*, No. 18-CR-517 (Bartow County Super. Ct. Mar. 14, 2018).  The Bartow County District Attorney moved to dismiss these charges after the Bartow County Superior Court suppressed all evidence associated with this prosecution because the officers illegally entered the home. Mot. to Enter Nolle Prosequi, *State v. Hall* (Bartow County Super. Ct. Sept. 25, 2018) (No. 18-CR-517).  The Bartow Court granted the State's dismissal motion.

49.     The visitors' humiliation continued inside the jail.  Jail deputies crowded visitors into small holding cells.  Some cells held about 30-40 visitors at a time.  Because of the cramped conditions, many visitors could not sit down.  They remained in these holding cells for 4-48 hours because the jail could not accommodate the large number of arrested visitors.  Some visitors remained in the holding cells until they bonded out of jail one to two days later.  The temperature inside the holding cells was about the same as it was outside.  Some of the holding cells had mattress-like pads for sleeping, and others did not.  Some cells did not have enough pads for everyone, so the guests took turns using them.  Access to blankets depended on who was asked; some deputies distributed blankets to some holding cells, while others didn't.  Some of the blankets smelled of urine. Some people tried to sleep on the floor regardless of whether they had a blanket or pad.

50.     Some jail staff posted signs reading "THE PARTY CREW" on the holding cell windows and laughed as they walked away.

51.     Jail staff then removed visitors one by one and took them to another area of the jail to be strip-searched.  Visitors, some as young as 17 years old, were ordered to remove all of their clothing in front of two or more deputies, bend over at the waist, spread their buttocks with their hands, and cough multiple times. Male visitors were further ordered to lift their genitals.  Once the search was over,

some visitors were allowed to wear the clothes they were arrested in, while others were given jail uniforms.  The jail staff took everyone's shoes and gave them jail slippers.

52.     Over the course of the next 72 hours, visitors asked for permission to call loved ones, but jail staff said they could not because of the "pending investigation."  Some jail staff refused to tell people what they were charged with, if they had bonds, when they would go to court, or anything else.

53.     Some visitors with medical conditions were denied proper treatment. One person who experiences seizures informed a jail nurse of her condition but did not receive her anti-seizure medication until the third day of her detention.  A pregnant woman was denied prenatal pills and received no care when she vomited repeatedly in a holding cell garbage can.  A diabetic received a dosage of insulin that exacerbated his condition.

54.     Those who complained about their treatment were either threatened with tasers or taken to small isolation cells with padded walls and concrete floors, and no bed or place to sit.  A hole in the floor served as the toilet.  Visitors sent to isolation cells were denied blankets to stay warm.  Some wrapped toilet paper around their arms, torsos, and feet because they were so cold.  Others exercised to

stay warm.  After about five to seven hours, the deputies let the visitors out of isolation and returned them to holding cells.

55.     Visitors remained in jail for one to three days without access to the court or counsel.  Their loved ones paid bond amounts preset by the Bartow County Sheriff's bond schedule to secure their release.

56.     Twelve days after their arrests and prior to indictment, the Bartow County District Attorney dismissed the warrants against all but one of the visitors "because the facts of the case indicate that there [was] insufficient evidence to convict" the visitors of any crime.

## B. Defendants' Unlawful Detentions, Searches, and Arrests Injured Plaintiffs.

57.     Though their criminal charges were dismissed, Defendants' actions have had a lasting impact on Plaintiffs.  Media outlets both in and outside of Georgia covered Plaintiffs' mass detention, arrest, and prosecution.  The media was aided in part by the Bartow County Sheriff's Office's unlawful posting of Plaintiffs' booking photos on its jail website in violation of Georgia law.[5]  The

---

[5] O.C.G.A. § 35-1-19(b) ("[absent certain circumstances], an arresting law enforcement agency or agent thereof shall not post booking photographs to or on a website.").  *See also* O.C.G.A. § 50-18-72(a)(4) (prohibiting the release of booking photos under Georgia's Open Records Act except under limited circumstances).

photographs remain on the jail's website as of the filing of this Complaint. As explained herein, Defendants' unlawful behavior has caused Plaintiffs economic, professional, and psychological harm.

### Plaintiff Daidron Williams

58.    Plaintiff Daidron Williams, the father of a young child, was employed at a window supply company at the time of his arrest on December 31, 2017. He had recently joined the company because it offered good pay and promotion opportunities.

59.    Williams attended the party with a friend who was home from the military. When the police arrived, Williams was inside the private home. Officers then detained Williams without inquiring into his knowledge of or purported ability to exercise control over any suspected marijuana in the home.

60.    Officers ultimately brought Williams to the front porch where they asked him his name, contact information, social security number, and where he was located when law enforcement first arrived. An officer then zip-tied his wrists together and led him to a van for transport to the county jail. No officer asked Williams if he knew there was suspected marijuana in the house or possessed any control substance before zip-tying his wrists and placing him under arrest.

61.    An officer patted Williams down before placing him on a transport van to the jail with about nine other people.  The officer did not find contraband on Williams or the other individuals he searched.  Once the van arrived at the jail, it sat outside for a lengthy period of time during which several people asked to use the restroom.  The driver refused to let anyone off to use the restroom.  As a result, one visitor urinated on himself.

62.    Several jail deputies strip-searched Williams after he was brought inside the jail.  They made him remove all of his clothes, lift his genitals, squat down to the floor, and cough three times.  Williams was detained in jail for two days before a loved one bonded him out.

63.    Williams missed three days of work because of his unlawful detention and arrest.  When he returned to work, he explained the reason for his absence to his supervisor and was immediately terminated.

**Plaintiff Nija Guider**

64.    Plaintiff Nija Guider is a 22-year-old machine operator and single mother of a 2-year-old son.  At the time of the party, she was employed at a restaurant.

65.    After leaving work, Guider attended the party with several childhood friends.  When police arrived, Guider was in the restroom.  Once she left the

24

restroom, she saw multiple officers in the front and back of the house.  She asked

an officer why the police were there.  The officer said everyone was being

detained.  The officer did not ask Guider if she was aware of any suspected

marijuana in the house, or if she possessed any controlled substance before telling

her she was detained.

66.     During the hours-long detention, Guider asked to use the restroom.

After an hour-long wait, an officer allowed her to use the restroom, but only with

the door open.

67.     After leaving the restroom, Guider went to the living room and sat

down on the floor to wait with the other visitors.  She could hear officers

rummaging through the attic.  After hours of waiting, Plaintiff Guider fell asleep

on the floor.

68.     She awoke to an officer ordering her to go outside.  Once outside,

officers patted her down between her legs and breasts.  This search did not yield

any drugs or other contraband.  Though the search yielded nothing, the officers

zip-tied Guider's wrists and led her to a transport van that held about sixteen other

women.  At no point did an officer ask Guider if she had knowledge of, or was in

possession of any suspected marijuana found at the party.

69.     Upon arriving at the Bartow County Jail, several jail deputies brought her to a room to perform a strip search.  Guider had to remove all of her clothes, squat to the floor, and cough.  Deputies then gave her a jail uniform and led her to a holding cell that already held 20-30 women.

70.     Throughout her detention, Guider feared for her son, and worried that he might be taken away from her.  She was ultimately released on bond after spending over two days in jail.

71.     After her release, Guider attempted to go back to work, but her employer fired her because of the publicity surrounding the mass arrest.  It took her two-and-a-half months to obtain another job.  During that time, she fell behind on all of her bills and relied on food pantries to feed her son.

72.     Right before her arrest, she and her son had been placed in a transitional home by a local homeless shelter.  The home requires that all residents pass periodic drug tests and all arrests must be reported to a case manager.  Guider feared she would lose her housing after this arrest and remains fearful of ever having another interaction with law enforcement.

**Plaintiff Keylon Woodard**

73.    At the time of the party, Plaintiff Keylon Woodard was one month away from enlisting in the U.S. military.  He attended the party to serve as a designated driver for other visitors.

74.    Woodard was on the back porch of the house when the police arrived. The police ordered him and others on the back porch to the front of the house.  At no point was he asked if he was aware of, or was in possession of marijuana at the party.  Two pat-down searches uncovered no drugs.  Despite the lack of probable cause to believe that Woodard had committed any crime, Defendants arrested him and charged him with possession of less than an ounce of marijuana.

75.    Once at the jail, he was placed with about 35 other visitors in a small holding cell where he remained for about six hours.  A deputy put a "PARTY CREW" sign on the holding cell's window.  Jail deputies then called him out of the cell and led him to another area to strip-search him.  Woodard, who had no prior arrests or interactions with law enforcement, attempted to cover his genitals during the search, but the deputies would not let him.  The deputies directed him instead to lift his genitals to ensure there was no contraband hidden there.  The deputies then ordered Woodard to spread his buttocks open with his hands, bend over, and

cough.  After the strip-search, the deputies took Woodard's clothes and ordered him to wear a blue jail jumpsuit.

76.    Woodard spent two days in jail before his release on January 2, 2018.

77.    Woodard was scheduled to enlist in January 2018, but that date has been delayed by his arrest in this case.  His recruiting officer reports that he needs more paperwork than previously required to demonstrate that he is fit to serve in the armed forces.

78.    Defendants' actions have also caused Woodard humiliation and mental anguish.  Though the criminal charges against him have been dismissed, his booking photo and reports of his arrest are readily available online.  His identity is now inextricably linked to the arrest and prosecution in this case.

### Plaintiff Aaron Conelly

79.    Plaintiff Aaron Conelly is a Bartow County native.  At the time of the party, he was stationed at the Dyess Air Force Base near Abilene, Texas, and was visiting family over the holiday break.  He attended the party at 2 Cain Drive with several childhood friends.

80.    Conelly was inside the private home when police arrived.  He observed them enter through the front and back doors.  Like others attending the party, he was detained for at least two hours.  During that time, officers searched

him and asked for his name, contact information, and date of birth.  Notably, no one asked him if he had knowledge of, or was in possession of marijuana or any other controlled substance.  The search yielded no contraband.  Despite the lack of probable cause to believe Conelly had committed any crime, he was arrested and taken to the Bartow County Jail, where he remained for 1.5 days before his father bonded him out.

81.    Employers and friends in Texas were already aware of Conelly's arrest by the time he arrived back at Dyess Air Force base in early January.  His supervisors questioned him about his ties to Cartersville, Georgia, and expressed disapproval of his actions.  He is now employed at an oil plant in Texas.  Before December 31, 2017, Conelly had no arrests or other interactions with law enforcement.

### Plaintiff Cayd Martin

82.    Plaintiff Cayd Martin worked as an operator at a construction company at the time of the party.  He attended the party as the designated driver for several high school friends and had not planned to stay long because he needed to be at work the next day.

83.    Martin was at the party for about ninety minutes before the police arrived.  He watched from the front of the house as police entered through the front

and rear doors.  Officers ultimately moved Martin to the front porch, where they

collected his name, date of birth, and contact information, but asked no questions

about his knowledge or possession of marijuana.

84.    Officers soon zip-tied Martin and led him to a police van.  Before he

was allowed on the van, an officer patted him down and asked if he had anything

on him.  Martin said no, and the search confirmed this.  Nevertheless, he was

driven to jail without any evidence or probable cause to believe that he had

committed any crime.

85.    After arriving at the jail, deputies led Martin to a room to be strip-

searched.  After the search, Martin was allowed to wear his clothes, but the

deputies refused to let him keep his jacket and socks.

86.    Deputies then moved Martin to a holding cell that held ten to twelve

people.  The temperature inside the holding cell was about the same as the

temperature outside.

87.    Martin complained to one deputy about their treatment and the delay

in moving through the booking process and getting phone calls.  A deputy

responded by removing Plaintiff Martin from the holding cell and placing him in

an isolation cell.  The isolation cell was even colder than the holding cell.  Martin

pushed a call-button to ask for toilet paper to wrap his body in but was threatened

with indefinite isolation time if he continued to ask for assistance, so he decided to

exercise to stay warm.  A deputy eventually removed Martin from isolation after

seven hours.

88.    Martin was in jail for two days before being released on bond.

89.    Martin missed two days of work because of this arrest.  His employer

was already aware of the arrest when he returned to work and asked him to take a

drug test so he could keep his job.  Martin took a drug test and passed.

90.    Martin had no criminal history before this arrest.

**Plaintiff Eutychus Wilson**

91.    Plaintiff Eutychus Wilson was a high school senior at the time of his

arrest.  He was also a prominent basketball player who aspired to attend college on

a basketball scholarship.

92.    On December 31, 2017, Wilson attended the party with several

friends.  When the police arrived through the front and back doors, he was in the

kitchen area.  Officers ultimately moved Wilson and others outside where he was

zip-tied and then searched, but never questioned about his knowledge or

possession of any marijuana found at the party.  No drugs or other contraband were

found during this search, but officers nevertheless arrested Wilson, charged him

with possession of less than an ounce of marijuana, and transported him to the county jail.

93.    After arriving at the jail, deputies led Wilson to a restroom area where he was strip-searched along with three other visitors. Deputies then moved Wilson to a holding cell where he spent the next 24 hours. During that time, he slept on a concrete floor without a blanket. The second day, deputies moved Wilson to the general population area of the jail, where he stayed until his release that night.

94.    Wilson was not allowed to play or practice with the school basketball team following his arrest. He fears that future employers will find his booking photo and stories about his arrest online.

**Plaintiff Andrea Lopez**

95.    Plaintiff Andrea Lopez is a college student and personal banker. She attended the party with a close friend. When the police arrived, she was in the living room and was attempting to leave, but an officer yelled for everyone to come out into plain view.

96.    Lopez remained inside the private home until an officer moved her and others outside. Once outside, a female officer patted down her clothes. Lopez was then told to wait for a transport van. An officer zip-tied her wrists before leading her onto the van. None of the officers who detained, arrested, and searched

Lopez inquired into her alleged knowledge or possession of marijuana found at the party.

97.    Once at the jail, Lopez was strip-searched and given a jail uniform. Deputies did not permit her to keep her underwear and bra and refused to provide underwear when asked.  Deputies then led Lopez to a holding cell with fifteen other women.  The deputies did not provide enough sleeping mats and blankets for everyone, so the women pushed their mats together and shared their blankets.  The air vents were pushing cold air into the holding cell, but when the women pushed a call-button to ask deputes to turn the air off, the deputies threatened to put them in isolation cells if they continued to complain.

98.    The following day, Lopez asked a deputy if she could call her employer to let them know that she would be missing work.  But her request was denied.

99.    Lopez spent 1.5 days in jail before bonding out.  Though she was able to return to work, Lopez is in constant fear of further interactions with the police.

**C. Defendants Violated Clearly Established Law.**

100.    It is clearly established that probable cause requires individualized suspicion, and that mere attendance at a party where a small amount of suspected marijuana is found is not sufficient to establish probable cause or otherwise render

reasonable the mass seizure, search, and ultimate arrest of every visitor in attendance. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.") (citation omitted); *see also Swint v. City of Wadley, Ala.*, 51 F.3d 988, 997 (11th Cir. 1995) ("Probable cause to arrest one suspect, and even probable cause to believe that a number of other or unidentified people had sold drugs in the establishment in the past, did not give the officers *carte blanche* to seize everyone who happened to be in the Club when the two raids took place."). *See also United States v. Gonzalez*, 70 F.3d 1236, 1238 (11th Cir. 1995); *States v. Pedro,* 999 F.2d 497, 502 (11th Cir. 1993); *Wilson v. Attaway*, 757 F.2d 1227, 1238 (11th Cir. 1985).

101.   It was clearly established on December 31, 2017, that constructive possession only exists when "a defendant is able to exert more than minimal control and dominion over the premises where the contraband is located and has actual knowledge of the contraband's existence." *Holmes v. Kucynda*, 321 F.3d 1069, 1080 (11th Cir. 2003) (citing *United States v. Rackley*, 742 F.2d 1266, 1272 (11th Cir. 1984)).

102.   It was clearly established on December 31, 2017, that a policy allowing the mass detention and arrest of visitors to a home based on the smell of suspected marijuana in certain common areas would violate Plaintiffs' clearly established constitutional rights.  *Ybarra*, 444 U.S. at 91; *Swint*, 51 F.3d at 997. Defendants had fair warning that their conduct would violate the Constitution, and any reasonable officer would have known of the binding precedent that establishes these clearly established rights.

103.   It was clearly established on December 31, 2017, that an arresting law enforcement agency cannot post booking photographs on its website.  O.C.G.A § 35-1-19(b).  *See also* O.C.G.A. § 50-18-72(a)(4).  Defendants John or Jane Does 21-25, with malice and callous indifference, posted Plaintiffs' booking photographs on the Bartow County Sheriff's website in violation of Georgia law, where they remain as of the filing of this Complaint.

104.   Based on the totality of the circumstances, the seizures and searches of Plaintiffs were plainly unreasonable.  Defendants' conduct lies so "obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was [or should have been] readily apparent . . . ."  *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997).

105.    Defendants are jointly and severally liable for the detentions, searches and arrests that were conducted, whether they personally participated in each or not as they were (1) confronted with a fellow officer's illegal act, (2) possessed the power to prevent it, and (3) chose not to act.  *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002); *Mick v. Brewer,* 76 F.3d 1127, 1136 (10th Cir. 1996); *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994); *Bruner v. Dunaway,* 684 F.2d 422, 425-426 (6th Cir. 1982); *Putman v. Gerloff,* 639 F.2d 415, 422-423 (8th Cir. 1981); *Byrd v. Brishke,* 466 F.2d 6, 11 (7th Cir. 1972).  *See also O'Rourke v. Hayes*, 378 F.3d 1201, 1210 (11th Cir. 2004) ("[A]ll officers, including those following someone else's lead, could be held liable under § 1983 if 'they knew or should have known that their conduct might result in a violation of the [plaintiff's] Fourth Amendment rights.'").

106.    Defendants are also liable for searches that they personally ordered or supervised.  *See Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (explaining that the causal connection required for supervisory liability under § 1983 exists when "the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.") (citation and internal quotation marks omitted).

107.   The City of Cartersville's policy of warrantless entry renders it liable under 42 U.S.C. § 1983.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  *See also Depew v. City of St. Mary's, Ga*., 787 F.2d 1496, 1499 (11th Cir. 1986).  Under this policy, police officers enter homes without warrants based on the smell of suspected marijuana, and seize everyone found inside the home.  Acting pursuant to that policy, Cartersville Police officers and Bartow County sheriff's deputies entered the private home at 2 Cain Drive and seized Plaintiffs.  Testimony from Cartersville police officers establishes the existence of this policy and the police officers' reason for entering and seizing Plaintiffs.  *See Brown v. City of Atlanta*, 284 F. Supp. 3d 1326, 1337 (2018) (holding that testimony from officers regarding the existence of a city policy allowing warrantless entry was sufficient to establish municipal liability) *appeal docketed*, No. 18-10436 (11th Cir. Feb. 6, 2018).

## CLASS ALLEGATIONS

108.   Plaintiffs bring this action individually and, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of similarly situated persons.  Plaintiffs seek to certify a class defined as:

> "all individuals who were detained, searched, and arrested by Cartersville Police Department and Bartow-Cartersville Drug Task Force employees at 2 Cain Drive, Cartersville, Georgia, on December 31, 2017, and whose criminal charges were dismissed

by the Bartow County District Attorney's Office on January 12, 2018."

109. Plaintiffs meet the requirements of Rule 23(a) in that:

a. The class is so numerous that joinder of all members is impracticable. The class consists of nearly all of the people detained and arrested at 2 Cain Drive on December 31, 2017—over 60 individuals.

b. Every class member's claim turns on the following question, which is therefore common to the class: whether a law enforcement officer may seize, search, and arrest an individual without any justification or individualized suspicion that that person committed a crime.

c. The claims of the named Plaintiffs are typical of the claims of the class because each member of the class was searched, seized, and arrested at 2 Cain Drive in Cartersville, Georgia, by employees of the Cartersville Police Department and Bartow-Cartersville Drug Task Force on December 31, 2017, with the same absence of any individualized suspicion.

d. The named Plaintiffs will fairly and adequately protect the interests of the class. The Plaintiffs possess the requisite personal interest in the subject matter of the lawsuit and possess no interests adverse to other class members. The Plaintiffs are represented by attorneys at the

Southern Center for Human Rights, a nonprofit organization with extensive experience in civil rights class action litigation, and the Merchant Law Firm, a firm with extensive experience in civil rights litigation.

e. Plaintiffs meet the requirement of Rule 23(b)(3) because common questions of law and fact predominate over questions affecting individual class members and a class action is superior to any other method of adjudicating this dispute.  In this case, where over 60 individuals were unlawfully searched, seized, and arrested by Defendants, a class action will permit common questions of law and fact to be resolved in one proceeding, and will avoid burdening the court with numerous, separate lawsuits that could result in inconsistent judgments.

## CLAIMS FOR RELIEF

### COUNT ONE

**Unconstitutional Seizure**

**Violation of the Fourth and Fourteenth Amendments to the United States Constitution, Brought Under 42 U.S.C. § 1983, and Violation of Art. 1, Sec. 1, Para. XIII of the Georgia Constitution**

**(by all Plaintiffs against Defendants City of Cartersville, Coker, Turner, Pulliam, LaFrance, Randall, Mayton, and John or Jane Does 1-20)**

39

110.    Plaintiffs re-allege and incorporate by reference paragraphs 1-109 of this Complaint as if fully stated herein.

111.    Defendants caused Plaintiffs and other visitors to be detained and jailed without individual suspicion, due to their mere presence at a party where small amounts of suspected marijuana were found.

112.    Defendants had no particularized and objective basis to believe that any Plaintiff they seized had committed or was committing any criminal offense or violation.

113.    Plaintiffs' mass detention was an unreasonable seizure under the Fourth and Fourteenth Amendments to the United States Constitution and under Ga. Const. art. I, sec. I, para. XIII.

114.    Plaintiffs' seizure and subsequent mass arrest lacked probable cause and was excessive and unreasonable in its duration and scope.

115.    Defendants intended to confine the Plaintiffs, committed acts resulting in their confinement, and the Plaintiffs were aware of their confinement.  The Plaintiffs reasonably did not believe they were free to leave.

116.    It was clearly established before the date of Plaintiffs' mass detention and arrest that seizing and detaining Plaintiffs simply because of their proximity to potential illegal activity would violate Plaintiffs' clearly established rights.

Defendants had fair warning that their conduct would violate the Constitution and no reasonable officer could have believed that the seizure or incarceration of the Plaintiffs was legal.

117.    In each and every instance set forth above, Defendants acted intentionally, with malice, and with actual intent to cause injury in the performance of their official functions.  Defendants knew or should have known that detaining Plaintiffs, without any legal authority, violated Plaintiffs' constitutional rights.

118.    As a direct and proximate result of Defendants' illegal policies and practices, Defendants deprived Plaintiffs and others of their liberty.  Defendants are jointly and severally liable for the violations of Plaintiffs' rights, and the harm they suffered as a result, because each Defendant either personally participated in the actions or failures to act, or implicitly authorized, approved, or knowingly condoned the wrongs at issue.

119.    Further, each Defendant has bystander liability for violating Plaintiffs' rights because each Defendant was (1) aware of a fellow Defendants' illegal acts, (2) had the power to prevent them, and (3) chose not to protect the Plaintiffs' from Defendants' illegal acts. *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002); *Mick v. Brewer,* 76 F.3d 1127, 1136 (10th Cir. 1996); *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994); *Anderson v. Branen,* 17 F.3d 552, 557

(2d Cir. 1994); *Bruner v. Dunaway,* 684 F.2d 422, 425-426 (6th Cir. 1982);

*Putman v. Gerloff,* 639 F.2d 415, 422-423 (8th Cir. 1981); *Byrd v. Brishke,* 466

F.2d 6, 11 (7th Cir. 1972).   *See also O'Rourke v. Hayes*, 378 F.3d 1201, 1210

(11th Cir. 2004).

120.   Defendants' above-described actions were willful, deliberate, and

malicious, and involved reckless or callous indifference to Plaintiffs' rights and

should be punished and deterred by an award of punitive or enhanced damages

against individual Defendants as permitted by law.

## COUNT TWO

### Unconstitutional Search

### Violation of the Fourth and Fourteenth Amendments to the United States Constitution, Brought Under 42 U.S.C. § 1983, and Violation of Art. I, Sec. I, Para. XIII of the Georgia Constitution

### (by all Plaintiffs against Defendants City of Cartersville, Coker, Turner, Pulliam, LaFrance, Randall, Mayton, and John or Jane Does 1-20)

121.   Plaintiffs re-allege and incorporate by reference paragraphs 1-109 of

this Complaint as if fully stated herein.

122.   Without probable cause, reasonable suspicion, or legal authority,

Defendants subjected Plaintiffs and other visitors attending a party at 2 Cain Drive

in Cartersville, Georgia, to physical searches of their bodies, for no other reason

than the presence in the residence of less than an ounce of suspected marijuana.

123. Defendants' mass search was not justified at its inception. Defendants subjected Plaintiffs to the searches and seizures described herein even though they had no reason to believe that any one individual Plaintiff had possessed marijuana or engaged in any other unlawful activity. Further, the mass search occurred after Defendants unlawfully entered the home without consent, a warrant, or exigent circumstance justifying their warrantless entry.

124. Defendants' mass search of Plaintiffs and other putative class members was not reasonably related to the circumstances that purportedly justified the search. Defendants had fair warning that their conduct would violate the federal and state constitutions and no reasonable officer could have believed that subjecting Plaintiffs and putative class members to these searches was legal in the absence of individualized suspicion or probable cause.

125. In each and every instance set forth above, Defendants acted intentionally, with malice, and with actual intent to cause injury in the performance of their official functions. Defendants knew that searching Plaintiffs and putative class members under the circumstances described herein violated Plaintiffs' constitutional rights.

126. Defendants are jointly and severally liable for the violation of Plaintiffs and putative class members' rights, and the harm Plaintiffs and putative

43

class members suffered as a result, because each Defendant personally participated in the actions described herein, expressly ordered or directed, or implicitly authorized, approved, or knowingly condoned or failed to remedy the wrongs at issue.

127.    Defendants' above-described actions were willful, deliberate, and malicious, and involved reckless or callous indifference to Plaintiffs and putative class members' rights and should be punished or deterred by an award of punitive or enhanced damages against Defendants as permitted by law.

## COUNT THREE

### Violation of Right to Privacy

**Violation of the Fourteenth Amendment to the United States Constitution, Brought Under 42 U.S.C. § 1983, and Violation of Art. I, Sec. I, Para. I of the Georgia Constitution**

**(by all Plaintiffs against Defendants Coker, Turner, Pulliam, LaFrance, Randall, Mayton, and John or Jane Does 1-20)**

128.    Plaintiffs re-allege and incorporate by reference paragraphs 1-109 of this Complaint as if fully stated herein.

129.    In the absence of probable cause, reasonable suspicion, or legal authority, Defendants detained Plaintiffs and other visitors for several hours and subjected them to physical searches of their bodies before sending them to jail.

44

130.    Defendants subjected Plaintiffs and putative class members to the mass search described herein even though they had no reason to believe that any one Plaintiff had engaged in any unlawful activity.

131.    Defendants subjected Plaintiffs to body searches that violated Plaintiffs' right to privacy under the Fourteenth Amendment to the United States Constitution and under Ga. Const. art. I, sec. I, para. I.

132.    Defendants had fair warning that their conduct would violate the federal and state constitutions.  No reasonable officer could have believed that requiring Plaintiffs and putative class members to submit to these searches was legal.

133.    In each and every instance set forth above, Defendants acted intentionally, with malice, and with actual intent to cause injury in the performance of their official functions.  Defendants knew that subjecting Plaintiffs and other visitors to the searches described herein violated Plaintiffs and putative class members' constitutional rights.

134.    Defendants are jointly and severally liable for the violation of Plaintiffs and putative class members' rights, and the harm they suffered as a result, because each Defendant personally participated in the actions described

herein, expressly ordered or directed, or implicitly authorized, approved, or knowingly condoned or failed to remedy the wrongs at issue.

135.   Defendants' above-described actions were willful, deliberate, malicious, and involved reckless or callous indifference to Plaintiffs and putative class members' rights.  Defendants should be punished or deterred by an award of punitive or enhanced damages as permitted by law.

## COUNT FOUR

### False Imprisonment

### (by all Plaintiffs against Defendants Mayton, Turner, Coker, Pulliam, LaFrance, Randall, and John or Jane Does 1-20)

136.   Plaintiffs re-allege and incorporate by reference paragraphs 1-109 of this Complaint as if fully stated herein.

137.   "False imprisonment is the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty."  O.C.G.A. § 51-7-20.

138.   By unlawfully detaining Plaintiffs and putative class members, and depriving them of their personal liberty, Defendants are guilty of false imprisonment, a tort for which an action for damages will lie under O.C.G.A. § 51-7-20.  *See also Ferrell v. Mikula*, 295 Ga. App. 326, 333 (2008); *Burrow v. K-Mart Corp.*, 166 Ga. App. 284, 287 (1983) ("The restraint constituting a false

46

imprisonment may arise out of words, acts, gestures or the like, which induce a reasonable apprehension that force will be used if plaintiff does not submit.")

139.    Without probable cause, reasonable suspicion, or legal authority, Defendants unlawfully detained Plaintiffs and other visitors for several hours and subjected them to physical searches of their bodies before sending them to jail.

140.    No offense had been committed in Defendants' presence or within the immediate knowledge of Defendants, and Defendants had no reason to believe that any one Plaintiff or putative class member had engaged in any unlawful activity.

141.    Defendants conspired to accomplish the unlawful objective of falsely imprisoning Plaintiffs and putative class members' by unlawful means.

142.    The false imprisonment was the act of the several Defendants jointly, and Defendants are jointly and severally liable for the entire damages pursuant to O.C.G.A. § 51-7-22.

## COUNT FIVE

### Battery

### (by all Plaintiffs against Defendants Coker, Turner, Pulliam, LaFrance, Randall, Mayton, and John or Jane Does 1-20)

143.    Plaintiffs re-allege and incorporate by reference paragraphs 1-109 of this complaint as if fully stated herein.

144.    Under Georgia law, a person commits battery when he intentionally touches another without consent in a harmful, insulting, or provoking manner.  *See Kohler v. Van Peteghem*, 330 Ga. App. 230, 234 (2014).  The unauthorized contact need not result in physical injury to constitute battery.  *Brown v. Super Disc. Markets, Inc.*, 223 Ga. App. 174, 175 (1996).

145.    After unlawfully detaining Plaintiffs and putative class members, Defendants committed battery when they (1) performed physically intrusive searches of Plaintiffs and putative class members' bodies without Plaintiffs' consent, (2) zip-tied Plaintiffs and putative class members' wrists together, and (3) took Plaintiffs and putative class members by the arms and led them to sheriff's vans for transport to the county jail.

146.    Defendants had fair warning that their conduct would violate the Constitution and no reasonable officer could have believed that performing nonconsensual bodily searches of Plaintiffs and putative class members without probable cause was legal.  Nor would any reasonable officer believe that binding the Plaintiffs and putative class members' wrists together and then placing Plaintiffs and putative class members on jail transport vans against their will was lawful in the absence of probable cause justifying their arrest.

147.   Defendants' above-described actions were willful, deliberate, malicious, and involved reckless or callous indifference to Plaintiffs and putative class members' rights.  Defendants should be punished or deterred by an award of punitive or enhanced damages against Defendants as permitted by law.

## COUNT SIX

### Violations of Georgia's Booking Photo Restrictions

### (by all Plaintiffs against Defendants John or Jane Does 21-25)

148.   Plaintiffs re-allege and incorporate by reference paragraphs 1-109 of this Complaint as if fully stated herein.

149.   Under Georgia law, an arresting law enforcement agency (or agent of the agency) cannot post booking photographs online except under limited circumstances.  O.C.G.A. 35-1-19(b).  *See also* O.C.G.A. § 50-18-72(a)(4).

150.   Defendants John or Jane Does 21-25 have and continue to post Plaintiffs and putative class members' booking photographs on the Bartow County Sheriff's website in violation of O.C.G.A. § 35-1-19(b).

151.   Defendants John or Jane Does 21-25 have had fair warning that their conduct violates Georgia law and could not have reasonably believed that posting the photographs on the jail's website was legal.

152.    Defendants John or Jane Does' 21-25 above-described actions were willful, deliberate, malicious, and involved reckless or callous indifference to Plaintiffs and putative class members' rights.  Defendants should be punished or deterred by an award of punitive or enhanced damages against Defendants as permitted by law.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs accordingly pray for the following relief:

a)    A trial by a jury of Plaintiffs' peers;

b)    Certification of a class pursuant to Federal Rule of Civil Procedure 23;

c)    Compensatory damages, in an amount to be determined by the jury;

d)    Punitive damages according to federal and state law as to individual defendants;

e)    A declaratory judgment stating that a law enforcement officer violates an individual's rights under the United States and Georgia Constitutions when he searches, detains, and arrests that person without consent or individualized suspicion that the individual has violated the law;

f)    A declaratory judgment stating that an arresting law enforcement agency violates an individual's privacy right under Georgia law when it posts booking photographs online in violation of O.C.G.A. § 35-1-19(b);

g)    A declaratory judgment stating that a custom or policy that permits: (1) a warrantless home entry based on the smell of suspected

marijuana, and (2) the detention of home occupants based on the marijuana smell violates the United States and Georgia Constitutions;

h)    Reasonable attorneys' fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable laws; and

i)    Such further relief as this Court deems just and proper.

DATED: This 11th day of March, 2019.

Respectfully submitted,

/s/ Gerald Weber
Gerald Weber
Ga. Bar No. 744878
Atteeyah Hollie
Ga. Bar No. 411415
Ebony Brown
Ga. Bar No. 412565
SOUTHERN CENTER
FOR HUMAN RIGHTS
83 Poplar Street, NW
Atlanta, Georgia 30303
(404) 688-1202 (phone)
(404) 688-9440 (fax)
gweber@schr.org
ahollie@schr.org
ebrown@schr.org

/s/ John Merchant
John Merchant
Ga. Bar No. 533511
Ashleigh Merchant
Ga. Bar No. 040474
THE MERCHANT LAW FIRM PC
701 Whitlock Avenue NW, Suite J43
Marietta, Georgia 30064
(404) 510-9936 (phone)

(404) 592-4616 (fax)
john@merchantlawfirmpc.com
ashleigh@merchantlawfirmpc.com

*Counsel for Plaintiffs*